Filed 2/27/13  In re R.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R.G., a Person Coming Under the Juvenile Court Law. | D061671 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J512149) |
| v. | |
| DENISE D. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Reversed and remanded.

I

INTRODUCTION

Denise D. (Denise) and Richard G. (Richard) appeal the juvenile court's order terminating their parental rights to their son, R.G., pursuant to Welfare and Institutions Code section 366.26.  (Further statutory references are to the Welfare and Institutions

Code.)  Denise also appeals the juvenile court's order denying her petition for modification under section 388, asking that R.G. be placed with her, or alternatively, that she be granted further reunification services.

We conclude the juvenile court abused its discretion in denying Denise's section 388 petition and, accordingly, reverse that order.  In view of that conclusion, we need not address the parents' other arguments challenging the trial court's order terminating their parental rights under section 366.26.  (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1416 ["In the chronology of these events, a fair hearing on the section 388 petition was a procedural predicate to proceeding to the section 366.26 hearing and disposition."]; *In re Lauren R.* (2007) 148 Cal.App.4th 841, 861 (*Lauren R.*) ["Because it is necessary to restore all parties to their prior positions, the orders terminating parental rights are also reversed"].)

II

FACTUAL AND PROCEDURAL BACKGROUND

A

*Early Dependency Proceedings*

Denise has eight children, of whom R.G. is the youngest.  Her oldest child is now an adult and was never a dependent of the juvenile court.  The next three children, all girls, were the subjects of Denise's first dependency case, due to her drug use.  Denise participated in drug treatment and successfully reunified with her children.  However, she later faced homelessness and voluntarily agreed that the girls be placed with a paternal aunt under a plan of guardianship.  In 2004, Denise gave birth to twin boys, and drugs

2

were again found in her system. Denise agreed to participate in parenting classes and drug treatment programs, but had difficulty following through with her case plan. Another daughter was born in 2007 with drugs in her system. Although Denise thereafter successfully completed most of her case plan objectives with respect to this child, she resumed the use of drugs (particularly marijuana and methamphetamines), and this daughter now resides with relative caregivers under a permanent plan of guardianship. R.G., the subject of this appeal, was born in November 2009.

The record is not entirely clear where or with whom R.G. lived during the first year of his life. Richard claimed that R.G. lived with him for "weeks at a time" during that period. The record also indicates, however, that Denise and her children were "chronically homeless." In November 2010, the twin boys were taken to Polinsky Children's Center after Denise failed to pick them up from school. A voluntary case was opened at that time to ensure the safety and welfare of the twins. Thereafter, however, it appeared Denise was not taking advantage of the services offered to her. The twins continued to have numerous absences, and were left at school for excessive periods of time. Denise failed to give her address to the Agency and failed to take a drug test upon the Agency's request. The twins reported being hungry because they had no food, and they were afraid for their lives where they lived.

On January 26, 2011, the San Diego County Health and Human Services Agency (Agency) filed a petition under section 300, subdivision (b) on R.G.'s behalf, alleging, based on the foregoing events, that there was a substantial risk he would suffer serious physical injury or illness due to Denise's failure or inability to adequately supervise and

protect him and his twin half-brothers. The Agency reported that Denise denied using drugs at the time of R.G.'s detention. However, based on Denise's extensive history of drug use and relapse after treatment, the Agency was concerned that she may have been using, which was contributing to the neglect of the children.

At the onset of R.G.'s dependency, Richard, R.G.'s father, was incarcerated and due to be released in May 2011. Richard has a lengthy criminal record and a history of domestic violence.

The juvenile court sustained the allegations of the Agency's petition regarding R.G. and declared him a dependent on March 2, 2011. The court found Richard to be R.G.'s presumed father. R.G. was placed in foster care separate from his twin half-brothers, but the court found that visitation with his brothers would not be detrimental to R.G., and ordered sibling visitation. The court granted Denise supervised visitation, and ordered that reunification services be offered to both parents.

In connection with the six-month review hearing, the Agency reported that R.G. remained in the foster home where he had been placed in January, but his caregiver had advised the Agency that she would not be an option for permanent placement. R.G.'s twin half-brothers had been removed from their foster home in July 2011 due to a reported incident of inappropriate behavior, but prior to that time, the boys had been having successful weekly visits with R.G., who responded well to his brothers. Notwithstanding his earlier statements asserting parental rights, Richard told the Agency after his release from prison that he did not wish to participate in any reunification services. However, he later told the social worker that he changed his mind again when

4

he saw that Denise was not "taking care of business."  He participated in weekly visitation with R.G. between September 2011 and March 2012.

The Agency reported that Denise had been looking for employment, but had not yet obtained work.  She had been having transportation and medical issues that negatively impacted her ability to participate in services and maintain visitation with R.G.  She was discharged from her parenting class due to noncompliance, and had not demonstrated to the Agency that she was clean and sober.  Denise's visits with R.G. were inconsistent, but when they did occur, Denise consistently demonstrated a parental role, encouraged R.G.'s learning and development, interacted with and responded to R.G. appropriately, showed empathy, and put R.G.'s needs ahead of her own.

The Agency recommended that reunification services for both parents be terminated, that sibling visitation continue, and that a section 366.26 hearing be set to select and implement a permanent plan for R.G.

On August 4, 2011, Denise called the social worker and informed her that she believed she needed residential drug treatment in order to be successful with her services, but she had difficulty following up with a substance abuse specialist to get referrals to such programs.  She finally met with the specialist on August 29, 2011, and was placed on the waiting list for Serenity House.  She began her residency there on September 28, 2011, with a recommended four- to six-month treatment plan.

The contested six-month review (set to coincide with the six-month review in the twins' case) was held on October 7, 2011.  Although Serenity House reported that Denise was in full compliance with her treatment program as of that date, based on her history,

5

the Agency believed Denise had not yet mitigated the factors that brought R.G. into dependency, and affirmed its prior recommendations. The juvenile court followed the Agency's recommendations and set a section 366.26 hearing.

B

*The Section 388 Petition and Section 366.26 Hearing*

After her entry into Serenity House, Denise began regular, supervised two-hour visits with R.G., during which she was attentive to his physical and emotional needs and demonstrated important parenting skills. For example, she interacted with him through conversation, physical play and pretend play. When R.G. became upset or threw a tantrum, Denise was able to divert him with a toy or a tickle. She brought him food and juice and a gift at Christmas. When R.G. was ill, she spoke with the social worker about the cause, and cut one visit short, asking that his caregiver take him to the doctor. She held R.G. in her arms and made him comfortable with a blanket while he fell asleep. R.G. easily and excitedly went to Denise at the start of each visit, enjoyed his time with her, and displayed no distress at leaving her.

By all measures, Denise did very well at Serenity House. She consistently tested negative for substances after her arrival. She participated in parenting classes and individual weekly therapy sessions. She was very active in group sessions, followed through on her assignments, and put a great deal of thought into her participation, freely sharing her insights about addiction, recovery and parenting. Her counselor stated that Denise had "learned to change her negative thinking into positive thinking" and had "grasped the solution to recovery." Although Denise completed her inpatient treatment

6

as of February 2012, she stayed at Serenity House while applying for sober housing and seeking employment. She continued to attend 12-step meetings and group sessions, volunteered for extra duties, served on the Serenity House council, and acted as a counselor and mentor for new clients entering Serenity House. Her treatment counselor described her as "an inspiration to those in our community and a role model to her peers."

Additionally, Denise made significant progress with her case plan regarding the twins. She told the twins' social worker that she was committed to sobriety, accepted responsibility for her past choices, and recognized the need to stay away from the "bad influences" that triggered her substance abuse in the past. The Agency recommended in that case that services be continued for an additional six months and that Denise begin unsupervised visits with the twins. The court accepted those recommendations.

Despite this progress, the Agency's position in R.G.'s case remained one of skepticism about Denise's long-term prospects. Its concerns stemmed from Denise's history of repeated treatment attempts and relapses, and an inability to provide a suitable living environment for her children. Although the Agency commended Denise for her recent success, it questioned Denise's ability to commit to sobriety. R.G.'s young age was a significant factor in the Agency's recommendations. He had been out of his mother's care for over a year, and although his visits with Denise had been successful, the Agency concluded the parent-child relationship was not so significant as to outweigh the benefits R.G. would obtain from permanency. The Agency also concluded that Richard's parental relationship with R.G. was not significant or valuable enough to outweigh the benefits of permanency, particularly given Richard's long and sometimes violent criminal history,

7

his vacillation on reunification with R.G., and his demonstration of some questionable parenting techniques during visits with R.G.

The Agency therefore recommended termination of parental rights and adoption as R.G.'s permanent plan. The Agency considered R.G. to be adoptable, but he was not then in a prospective adoptive placement. He had bonded with his caregiver, but she had stated she was unwilling to adopt him. At that time an adoptive placement had not yet been identified.

At the March 19, 2012 pretrial status conference preceding the section 366.26 hearing, Denise filed a section 388 petition seeking modification of the juvenile court's finding that she had not made significant progress with her case plan and its ruling that reunification services be terminated. Denise requested, in light of her progress over the prior months, and also the fact that she was in the process of reunifying with R.G.'s twin brothers, that the court either place R.G. with her or reinstate reunification services to allow R.G. to transition into her care. At that same hearing, R.G.'s twin brothers also moved under section 388 to request that the court recognize their standing to assert the sibling relationship exception to R.G.'s adoptability, under section 366.26, subdivision (c)(1)(B)(v). The juvenile court granted the twins' request. It also found that Denise had made a prima facie showing under section 388, allowing her to go forward and demonstrate the changed circumstances warranting modification, while at the same time informing her that she had an "uphill fight" in view of her history.

The contested section 388 hearing was held on March 27, 2012. R.G.'s appointed counsel indicated she was joining in Denise's section 388 petition to the extent it sought

8

reinstatement of services, and in the event that request was granted, to continue the 366.26 proceeding to the 18-month date. The court then heard testimony from Denise's treatment counselor, from Denise and from the Agency's social worker.

Denise's counselor, who had daily contact with Denise during her treatment program at Serenity House, stated that Denise completed all the requirements of her treatment program, actively participated in parenting classes, group sessions and 12-step meetings, and worked closely with her sponsor. Her spirituality-based programs were in the community, and it was Denise's responsibility to transport herself to and from those meetings. Denise was on the Serenity House Council, which consists of women who are "role models" and can help new clients in the program. She testified that Denise remained at the residential home after completing her treatment to learn additional skills to enable her to maintain sobriety, secure employment and obtain housing. Serenity House would assist her in those efforts, including providing living space that could accommodate her children. Denise was at that time on the waiting list for Genesis House, a program providing transition housing.

Denise related to the court the history of her substance abuse and her prior dependency cases. She testified that what had changed for her since then is that she had come to understand what she needs to do to stay clean and sober and that she was willing to work hard at her recovery. Before, she never followed through with her treatment program, but this time she had done so. She discovered that she had to stay away from the "old people and old places" that were triggers for her relapses in the past. Denise also indicated that growing older had helped her recovery because she cared much more now

9

about taking care of her health. She decided to stay on at Serenity House to continue her recovery "until I am truly ready to leave." Denise also explained that the twins were in her care when R.G. was born, and they were together for the first year of his life. She explained the twins "really loved" R.G. and they had played together all the time.

During his testimony, the social worker handling R.G.'s case stated that although he applauded Denise's recent efforts at recovery, he was concerned that she had been living at a secure facility, has not yet obtained employment or housing, and thus had not been functioning on her own and demonstrating that the factors that compelled removal of her children had been ameliorated. He acknowledged there would be no risk to R.G. if Denise were allowed to visit with him in the "supervised environment" of Serenity House, but he would be concerned as to how she would feed and transport R.G. The social worker also testified that continuing sibling visitation would be beneficial and not be detrimental to R.G.

The juvenile court denied Denise's section 388 petition, explaining that Denise's burden was to "show that circumstances have *changed* since October 7, 2011," but she had only demonstrated that circumstances were "*changing*." (Italics added.) The court clarified that it was not necessary for Denise to prove that she was "cured," was "all better," or "out on her own, in her own housing, working, taking care of all her children before I can find a change." It acknowledged, too, that Denise had successfully completed treatment over five months and was addressing her issues. However, the court emphasized, Denise was still in "a protected setting" and therefore "had to deal with no real stressors . . . hasn't had to deal with a job, with housing . . . hasn't had children in her

10

care [or] had any experience of living in the real world."  Given her extensive history of drug use and failed treatment, the court concluded Denise "has not arrived anywhere near that place yet where we could say we could trust, with some small level of confidence . . . that it would be in the child's best interest to either place him with her or give her more services."  The court found there was "no evidence" that it was in R.G.'s best interest "to gamble and say we are going to place him with mom and hope that she is able to do what she needs to do."  Rather, given R.G.'s age and the fact that he has been out of his parents' care for over a year, it was in his best interest not to make him wait for permanence.

The section 366.26 hearing was held two days later.  The parties previously had stipulated that relevant evidence introduced at the section 388 hearing could also be considered at the section 366.26 hearing.  The court accepted the stipulated testimony of the twins indicating that they cared for their brother, wanted to keep seeing him, and did not want him to be adopted, at least by someone they did not know.  The Agency reiterated its recommendation that parental rights be terminated and argued that the beneficial parent-child and sibling exceptions to an adoption plan did not apply.  The juvenile court adopted the agency's recommendation, found that neither exception applied, and selected adoption as R.G.'s permanent plan.

DISCUSSION

A

*Legal Principles and Standard of Review*

Under section 388, a parent, interested person or the dependent child may petition the court to change, modify or set aside a previous order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).) The petitioner requesting the modification has the burden to show, by a preponderance of the evidence, that there is "a change of circumstance or new evidence," and that the proposed modification is in the child's best interests. (§ 388, subds. (a), (c); *In re Jasmon O*. (1994) 8 Cal.4th 398, 415 (*Jasmon O*.).)

After reunification services have been terminated, section 388 provides an "escape mechanism" forestalling termination of parental rights by allowing the court to consider a legitimate change in the parent's circumstances. (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309 (*Marilyn H*.).) This procedural mechanism, viewed in the context of the dependency scheme as a whole, provides the parent due process while accommodating the child's right to stability and permanency. (*Id*. at p. 307.) In this context, it is presumed that continued out-of-home care is in the child's best interest. (*Id*. at p. 310.) The parent may rebut that presumption by showing changed circumstances that would warrant further consideration of reunification. (*Ibid*.)

In determining whether reunification is in the child's best interests, the juvenile court should consider a number of factors, including: "(1) the seriousness of the problem

which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*).)  This list is not meant to be exhaustive. (*Ibid.*)

We review the grant or denial of a section 388 petition for an abuse of discretion. (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.)  While the abuse of discretion standard gives the court substantial latitude, "[t]he scope of discretion always resides in the particular law being applied, i.e., in the 'legal principles governing the subject of [the] action . . . .'  Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion. [Citation.]" (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.)

B

*The Juvenile Court Misapplied Section 388*

In this appeal, we are presented with the difficult question of when a parent's changed circumstances and a child's best interests combine to overcome the presumption that, after a section 366.26 hearing has been set, a child's need for permanency and stability takes precedence over a parent's interest in reunification. (*Marilyn H.*, *supra*, 5 Cal.4th at pp. 309, 310; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  The juvenile court, in a detailed explanation of its reasoning, weighed what it acknowledged to be Denise's successful steps toward recovery against her history of drug abuse, failed past treatment efforts, and the fact that she had not long been in recovery.  It found that

13

Denise's circumstances, though "changing," had not "changed," and that there was virtually no evidence demonstrating that it was in R.G.'s best interests to "make him wait for permanence."

"It is rare that a denial of a section 388 motion merits reversal as an abuse of discretion." (See *Kimberly F.*, *supra*, 56 Cal.App.4th at p. 522.) Reversal is not, and ought not be, lightly undertaken. This is so particularly where, as here, the juvenile court appears at first glance to have thoughtfully considered all the evidence and correct legal criteria. Nevertheless, we conclude this is one of those rare cases warranting reversal. On closer examination of its ruling, we are of the view that the juvenile court, while acknowledging the standards by which a "change of circumstances" under section 388 is gauged, erred in applying those standards to Denise's situation, in effect holding her to the very type of evidential proof the court noted was not necessary for relief to be granted. Notwithstanding the otherwise thoughtful analysis of the juvenile court, this was an abuse of discretion. (See *City of Sacramento*, *supra*, 207 Cal.App.3d at p. 1297-1298 [an abuse of discretion occurs not only where the court's action "was utterly irrational," but also where the court "is mistaken about the scope of its discretion . . . [I]f the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law"].)

When the juvenile court explained the basis for its section 388 ruling, it began by stating that the law required Denise to show only "a *reasonable* change in the circumstances ─ in the *ability* . . . of the mother to address the problem that led to the dependency in the first place." (Italics added.) The court observed that Denise did not

14

have to prove she was "cured" of her substance abuse issues, or was functioning successfully "out on her own," holding down a job, and "in her own housing," to demonstrate the necessary "change of circumstances." Yet, in denying section 388 relief, that is precisely the evidence the court deemed was missing, when it emphasized that Denise had been living "in a protected setting" at Serenity House, with "no real stressors." "She hasn't had to deal with a job, with housing. She hasn't had children in her care." Absent evidence of this type of "experience of living in the real world," the court found, Denise had not demonstrated she had reached the point where the court could "trust, with some small level of confidence," that it would be in R.G.'s best interest to at least reinstate services. The court abused its discretion in so concluding because it raised the legal bar too high, and as a result, failed to apprehend that Denise's evidence satisfied what the court appeared to recognize at the outset was the correct legal standard.

*Kimberly F.* requires us to examine the problem that led to the dependency, the reasons for its continuation, and the degree to which it might be, or actually has been, resolved or ameliorated. (*Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 530, 532-533.) Denise acknowledged her long history (about 15 years) of substance abuse ─ without question, a serious problem that is an all too common reason children are placed in the dependency system. (See *id*., at p. 532 [citing drug abuse as one of the more "intractable" problems in dependency proceedings].) Denise also admitted to failed attempts at recovery in the past. Although the Agency and the juvenile court applauded Denise for her success at Serenity House, her decision to enter that program came nearly eight months into R.G.'s dependency case. Given her past pattern of use, successful

15

completion of a treatment program, and then relapse, the court and the Agency concluded that she had not been in recovery long enough to instill *any* degree of confidence, however small, that she could sustain it well into the future ─ hence their view that Denise was "changing," but not "changed."

This conclusion is belied by the evidence. The problem that brought R.G. and his twin brothers into dependency was Denise's repeated drug use and the resulting neglect of her children. The law required the juvenile court to determine whether Denise's circumstances had changed to the point where she had "reasonably" demonstrated "an ability" to address that problem. (See *Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 532 [court should consider "degree to which the problem may be easily removed or ameliorated"].) The significant factor supporting section 388 relief in this case ─ and the one that, in our view, the juvenile court failed to grasp ─ is not merely that Denise was able to stay clean and sober for a few months, but rather, that she had *fundamentally altered her approach to recovery.* As Denise testified, she realized that prior out-patient programs were not successful because she remained exposed to the circumstances that triggered her use. Upon entering Serenity House, she was able to surround herself with counselors, take full advantage of programs, and obtain and utilize a sponsor. Critically, Denise accepted responsibility for the bad decisions of her past, identified the reasons for her prior relapses and had consciously worked to avoid the "bad influences" that threatened her prior attempts at continued recovery. Her counselor remarked that she had "grasped the solution to recovery" The Agency presented no evidence contradicting that evaluation. Further, Denise had become a "role model" and "inspiration" to other women

16

in the program, and an active participant in all activities, including volunteering for various tasks.

This uncontradicted evidence demonstrates that Denise had not simply been going through the motions of recovery, but rather, finally appeared to have discovered the keys to its continued success. Denise showed far more here than mere sobriety over a period of months. She demonstrated a true "commitment to sobriety," the existence of which the Agency had questioned, by taking the very steps that were absent in her past attempts at treatment. To be sure, relapse is always a risk for recovering addicts. (See *In re Clifton B.* (2000) 81 Cal.App.4th 415, 423 (*Clifton B.)* ["relapses are all too common for a recovering drug user"].) The Agency correctly notes that a number of courts have denied section 388 modification where the evidence showed a pattern of use, treatment and relapse. (See, e.g., *In re Amber M.* (2002) 103 Cal.App.4th 681, 686 (*Amber M.*); *Clifton B.*, *supra*, 81 Cal.App.4th at p. 423; *In re Casey D.* (1999) 70 Cal.App.4th 38, 48-49 (*Casey D.*).) Although such evidence undoubtedly bears careful consideration, it must be viewed in context of the overall record, and each case must be determined on the basis of its own facts. Such evidence does not and should not give rise to the equivalent of an irrebutable presumption against reinstating services. Yet, the Agency in this case appears to have taken something very close to that position, arguing that R.G. "needed stability and permanency now, not after more *futile* service offerings." (Italics added.) In other words, in the Agency's view, Denise already was a lost cause, and because of her history, any additional services ─ even for just enough time to allow Denise to demonstrate the ability to maintain a sober lifestyle outside the "protected" Serenity House

17

environment—would be futile. The juvenile court similarly concluded that in light of Denise's history, and the relatively short period of her sobriety preceding the section 388 petition, it was too much of a "gamble" to grant any additional services.

Section 388 was designed to be an "escape mechanism" — in effect, a last chance — to avoid termination of parental rights. (See *Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) It seems tailor-made for those parents who do not come to grasp the real-life consequences of the dependency process until late in the day. Indeed, section 388's function of providing a last-minute reprieve from section 366 termination would seem pointless if a parent were first required to prove — as both the Agency and the juvenile court here apparently assumed — that he or she has sustained sobriety over an extended period of time, because such proof presumably would have forestalled termination of services in the first place. If section 388 is to have any substance, a parent should not be written off merely because she has struggled with addiction and relapse in the past. This is particularly so when, as here, the preponderance of the evidence indicates she finally appears to have turned the corner, accepted responsibility for past bad decisions, gained true insight into the nature of her addiction and its effect on her children, and actively taken steps to better herself and provide for her children.

One of these steps was Denise's decision to stay on at Serenity House after completion of her treatment program, until she is able to find employment and affordable housing. The juvenile court apparently viewed this as a negative factor in the section 388 analysis, interpreting Denise's desire to stay in a positive environment that strengthens her recovery as evidence that she has not yet demonstrated an inability to deal with the

"real world." On the contrary, when considered in the context of the record as a whole, we view her decision to stay at Serenity House as further evidence that Denise has made a significant shift in her thinking about her addiction, and recognized the importance of solidifying her recovery and strengthening her life and parenting skills *before* fully taking on the "real world." In any event, there was evidence that she in fact had begun the process of addressing real world issues ─ for example, by seeking employment on a regular, consistent basis, applying for affordable housing, and also by attending community church services and Bible study classes twice a week.

On the foregoing record, the juvenile court's finding that Denise's circumstances had not changed within the meaning of section 388 is not supported. If anything, the record overwhelmingly supports the view that Denise had learned the hard lessons of her past and had developed the insight, maturity and skills to stay on the path of recovery, thus distinguishing her situation from other cases cited by the Agency. (Cf. *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228-1230 [mother had failed to avail herself of services, "did not understand the impact her inability to provide structure, stability and consistency had on the children," and was dependent for support on a person with a violent history]; *Amber M.*, *supra*, 103 Cal.App.4th at pp. 686 [mother completed treatment program but failed to demonstrate empathy for children or an understanding of their psychological difficulties]; *Clifton B*., *supra*, 81 Cal.App.4th at pp. 420-421 [father could not maintain sobriety even after children were returned to him after 12-month review].)

It is not enough, of course, that Denise's circumstances have changed. She must also show that it would be R.G.'s best interests to grant relief under section 388. (See § 388, subd. (c); *Kimberly F.*, *supra*, 56 Cal.App.4th at p. 529; *Jasmon O.*, *supra*, 8 Cal.4th at p. 415.) The court found, there was "not any evidence other than mother's nice relationship with the child . . . that it would be in [R.G.'s] best interest to either make him wait for permanence . . . or to place him with the mother at this point." Of particular significance for the trial court was R.G.'s age. At the time of the section 388 hearing, R.G. was about two and a half years old, and had been out of his mother's care since January 2011. The Agency argued, and the trial court apparently agreed, that stability and permanency were especially important for a young child, and Denise had failed to show that her interest in reunification outweighed R.G's interest in obtaining a permanent home.

The second *Kimberly F.* factor requires consideration of "the strength of relative bonds between the dependent children to *both* parent and caretakers." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.) In the early dependency period, Denise was inconsistent in her visits with R.G., but once she began her program at Serenity House, her visits were consistent and entirely successful. She displayed appropriate parental skills, and loving maternal care. R.G. enthusiastically went to his mother and enjoyed his visits with her.

The evidence thus showed that a bond had begun to form, or re-form, between R.G. and Denise. R.G. had also bonded with his caretaker, but importantly, that

20

individual was not able to adopt R.G. As of the date of the section 388 hearing, no permanent adoptive placement had been arranged, although it appeared a potential placement had been identified. The social worker testified that allowing continued supervised visits with Denise would not be detrimental to R.G. In fact, the only concerns the social worker specifically identified were whether Denise would be able to "feed" R.G. and "get him from point A to point B." The undisputed evidence showed, however, that Denise provided food for R.G. at every visit and had demonstrated an ability to transport herself to and from community programs, such as church services.

Of particular significance in this case is that Denise was in the process of reunifying with her twin sons. The Agency concluded in February 2012 that, although it would be premature at that time to place the boys with her, Denise had made "significant progress in resolving the problems that led to the [twins'] removal from the home, and has demonstrated the capacity and ability both to complete the objectives of [her] treatment plan and to provide for the [twins'] safety, protection, physical and emotional well-being and special needs." Assuming she could maintain that progress, the Agency believed there was a "substantial probability" of reunification with the twins. The Agency therefore recommended continuing services and unsupervised visits between Denise and the twins. There was undisputed evidence that R.G. had enjoyed successful visits with his brothers; that the boys cared for R.G. and did not want him to be adopted; and that, according to the social worker, maintaining the sibling relationship would be "beneficial" and not detrimental to him.

21

This evidence shows a family unit in the process of reunification, and a parent who, although late in committing to recovery, had made a dramatic turnaround in a short period of time and was demonstrating skills necessary to meet her children's needs. Particularly where there was not yet a potentially adoptive placement and therefore no competing bonds with another caregiver, and where there was no discernable risk to continuing the mother-child relationship, the evidence strongly favored continued development of the biological family bonds. (See, e.g. *In re Vanessa P.* (1995) 38 Cal.App.4th 1763, 1771 ["The purpose of dependency court proceedings is to reunite families."].)

In the view of the juvenile court, however, two factors in particular militated against a finding that additional services or immediate placement with Denise would be in R.G.'s best interests. The first was that not enough time had elapsed for the court to be assured that Denise would not begin to use again. As explained previously, we do not believe this factor, when considered in light of all the evidence and the purposes of the statute, necessitates denial of section 388 relief. The second factor of particular concern to the juvenile court was R.G.'s young age. "Childhood does not wait for the parent to become adequate." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) It was appropriate for the juvenile court to consider this factor, notwithstanding Denise's likely reunification with her older sons, because the standard is more rigorous when very young children are involved. (See, e.g., *Casey D.*, *supra*, 70 Cal.App.4th at pp. 48-49 [16-month-old child's age a factor in denying section 388 petition, because child that young is not "able to

22

protect herself if the parents should relapse, in contrast to her older sister"].)  But again, this factor must be viewed in context.  Unlike the mother in *Casey D.*, Denise already has demonstrated a high level of commitment to a sober lifestyle and the ability to put her children's needs first.  (*Id.* at p. 45.)  For example, she embraced and actively participated in all the programs and services offered at Serenity House, presented her "autobiography" ─ a " 'significant part of the recovery process' " (*id*. at p. 43) ─ successfully completed her inpatient treatment plan, was actively involved with a 12-step program, and was utilizing her sponsor.  So successful was she that she became a "role model" and "inspiration" to other residents.  (Cf. *id*. at p. 43, 48 [mother was not working on 12-step program and had not yet written her autobiography].)  Additionally, Denise had made the decision to stay on at Serenity House, where her children could stay with her or at least continue to visit with her, thus ensuring that the children would have a safe environment and their needs could be met, and Denise could continue to strengthen her parenting skills so as to lessen the danger of relapse after she went out into the community on her own.

We do not suggest that the juvenile court here was required to return R.G. to Denise's care based on the evidence presented.  Although Denise requested that relief, she alternatively requested reinstatement of services.  R.G.'s counsel supported the petition, but only to the extent it sought additional services.  We hold only that based on the record evidence, the juvenile court's finding that there was *no* evidence that *any* section 388 relief would be in R.G.'s best interests cannot be sustained.

For all the foregoing reasons, we conclude the juvenile court abused its discretion in denying Denise's section 388 petition, and in failing to order additional services.

23

IV

DISPOSITION

The order denying Denise's section 388 petition is reversed, and consequently, the order terminating Denise's and Richard's parental rights is also necessarily reversed. (*Lauren R.*, *supra*, 148 Cal.App.4th at p. 861; see, Cal. Rules of Court, rule 5.725(a)(2) & (g) [with limited exceptions, court may not terminate parental rights of only one of two surviving parents].)  The matter is remanded to the juvenile court for further proceedings consistent with this opinion.

McINTYRE, J.

I CONCUR:

BENKE, Acting P. J.

24

HALLER, J., dissenting:

The majority sets forth persuasive reasons why in its view Denise's modification petition had merit. However, the trial court also set forth well-reasoned grounds that support its decision to deny the petition. As a reviewing court, we must defer to the trial court's findings that are supported by the record.

In a thoughtful oral ruling, the court referenced Denise's "very serious" drug history, along with a history of "multiple dependencies, multiple removals of children, multiple relapses, [and] multiple treatment programs." The court recognized the importance of comparing the severity of Denise's original problem to Denise's progress in addressing that problem and concluded Denise is just "beginning to give up her life as an addict." The court was particularly concerned that all of Denise's progress had taken place in a protected setting where her ability to cope with parental responsibilities, housing and employment had not been tested and thought it important that Denise herself was "not ready to leave the protection of Serenity House."

The court was mindful that the Legislature has set forth different considerations and time constraints for children under the age of three, noting this is a critical time period in a young child's life. The court found that Denise had failed to establish it would be in R.G.'s best interest to place him in Denise's care or delay permanency for six months while Denise was given additional services.

Undoubtedly, this was a close case and Denise's progress was impressive. But, in my view, because the trial court's factual findings are supported by substantial evidence and the trial court considered appropriate legal factors in making its decision, I cannot

say the trial court abused its discretion.  Accordingly, I would affirm the trial court's decision denying Denise's section 388 petition.


HALLER, J.